UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TONYA PINNEY,                    ]
                                 ]
        Plaintiff,               ]
                                 ]
    vs.                          ]        1:09-cv-0235-LSC
                                 ]
SOUTHERN NUCLEAR OPERATING       ]
COMPANY, INC.,                   ]
                                 ]
        Defendant.               ]

MEMORANDUM OF OPINION

I.    Introduction.

        Pending is Defendant's motion for summary judgment, filed on April 9,

2010.  (Doc. 30.)  Defendant Southern Nuclear dismissed Plaintiff Pinney

from her job as a chemist at the Farley Nuclear Plant near Dothan, Alabama.

Because of that dismissal, Pinney filed this suit alleging sexual harassment,

discrimination, and retaliation under Title VII, 42 U.S.C. § 2000e,

discriminatory pay prohibited by the Equal Pay Act's ("EPA's") amendments

to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206(d),  and retaliation

under the EPA and FLSA, 29 U.S.C. § 215(a)(3).  Southern Nuclear now moves

for summary judgment on those claims, arguing primarily that any harassment resulted from animosity between Pinney and Leonard Worthy, a coworker with whom she engaged in a sexual affair; that her dismissal resulted from Pinney's conduct, not her gender; that any statutorily-protected complaints she made did not cause her dismissal; and that any pay disparities resulted from insufficient prior experience.  The issues raised in Defendant's motion for summary judgment have been briefed by both parties and are now ready for decision.  After considering the legal arguments and presented evidence, Defendant's motion for summary judgment is granted.

II.    Facts.[1]

Pinney's career with Southern Nuclear began in December 2000.  Earl Patterson and Heath Mansfield also began working at Southern Nuclear then. All started as Chemistry Technician II's paid a base salary of $2,375 adjusted upward for entering experience.  Pinney received $2,550 monthly, a bump

---

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

resulting not from her time working in a bank, department store, or convenience market but from her Masters Degree in Environmental Analysis and Management.  Patterson and Mansfield each received a bump to $2,935, Patterson because of a prior career in the Navy and of three years spent as a chemist, Mansfield because of his prior work as a chemist. (Doc. 31-22 at 5-7.)

As new chemistry technicians Pinney and her peers had unescorted access to the plant, which they spent following other technicians around. They could not perform shift chemist work without training however. Southern Nuclear requires its Chemistry Technicians to spend six months undergoing classroom training.  After the classroom training, the technicians must complete several sets of job performance measures ("JPMs").  A mentor assists each new technician with the first JPM set.  But the technicians must complete the second set on their own.  After the second set, Southern Nuclear encourages technicians to complete specialized task JPMs as time allows.

In February 2002, Pinney and her peers began classroom training. In July 2002, Southern Nuclear hired Steven Newton as a Chemistry Technician

II, starting him at $3,495 a month based on his decade-long experience as a chemist.  (Doc. 31-22 at 9.)  In December 2002, Pinney, Patterson, and Mansfield all received their progressive promotion to Chemistry Technician I.  (Doc. 27 at 3-4.)  Pinney and her peer technicians completed their classroom training, and Southern Nuclear assigned them in late 2002 to crews of other chemists.

Throughout 2003 and 2004, Pinney focused on gaining the requisite JPMs to gain status as a shift chemist. (Doc. 31-10 at 15.) But once she completed the second required set, she had trouble completing the specialized JPMs.   (Doc. 31-10 at 17.)   Regardless, her 2003 review commended her for displaying a "can-do attitude," by demonstrating "the ability to work well without direct supervision," and for being "a dependable, self-motivated technician." (Doc. 31-26 at 10.)

In June 2004, Pinney, Patterson, and Mansfield all received their progressive promotion to Senior Chemistry Technician.  Also in 2004, Leonard Worthy, a senior chemistry technician on Pinney's crew, began training her on various shift chemist JPMs.  (Doc. 31-10 at 46.)   A consensual sexual relationship apparently developed between Pinney and Worthy.  Working one

night together after Thanksgiving, Worthy suggested that the relationship had been a mistake, shocking Pinney because she believed he cared for her. (Doc. 31-10 at 47.)  So the sexual relationship ended, and Pinney switched crews in January 2005.  Her 2004 performance review commended her as a "dependable worker" and suggested that she focus on the specialized task JPMs. (Doc. 31-25 at 97.)

During one rare 2005 interaction with Worthy, Pinney suggested to Worthy that she would wait for him knowing he was married.  Near the end of 2005, Worthy "did a complete change." (Doc. 31-10 at 52.)  Having warned Worthy that she would alert his wife if he did not, "Pinney called Worthy's wife and told her" about the affair.  (Doc. 43 at 18.)  Worthy and Pinney "[p]retty much avoided each other" after that incident.  (Doc. 31-10 at 52.)  Worthy revealed the telephone call to a co-worker in a written memo—because his immediate supervisor was absent. (Doc. 39-1 at 2.) Tony Livingston, the Chemistry Manager, also learned of the telephone call and eventually received the memo.  (Doc. 31-7 at 16.)

For 2005, Pinney's performance evaluation rated her as having fully met expectations.  (Doc. 31-10 at 22.)  But she had not completed the

remaining specialized JPMs and on one occasion left the ammonium chloride feed on for too long, a mistake for which Livingston called her to his office. (Doc. 31-10 at 23.) During that conversation, Pinney began to cry, prompting Livingston to suggest that maybe her hormones caused the crying.

In late 2005 or early 2006, Pinney became concerned that Newton, whom she had begun training, made more money than her; she investigated further, perceiving a disparity between her pay and the male technicians'. (Doc. 31-10 at 44.) Pinney then raised the issue during her year-end review. Her supervisor later requested the names of the male technicians that Pinney thought made more than her. Not wanting to get anyone into trouble, Pinney did not send the names. As a result, her supervisor did not further pursue the matter.

Then, in June 2006, Pinney again went to her supervisor, this time with questions about overtime pay. Unsatisfied with her supervisor's explanation, Pinney took the issue to Livingston. He held a June 5, 2006 meeting, the summary of which states the following: "Her reaction to this decision along with input from other supervisors on other instances indicate Tonya has displayed a negative attitude toward supervisory decisions." (Doc. 31-2 at

88.)  Livingston, the Chemistry Manager, stated that "if the problem was not resolved this time, that the next time a visit was requested . . . that someone (supervision or Tonya) would be disciplined and that a decision as to whether Tonya wanted to work at Farley might need to be made."  (Doc. 31-2 at 88.)

Pinney's 2006 and 2007 performance reviews set forth that she fully met expectations and provided her with a merit increase and an incentive award.  The reviews did recommend that she complete various specialized task JPMs.

After years of "tension" from the affair, Pinney called the acting chemistry manager on February 28, 2008, and requested a meeting with him and Worthy because she feared the tension would prevent her from completing specialized JPMs.  (Doc. 31-10 at 59.)  Her annual reviews had noted that she lacked specialized JPMs, even though the lack of such JPMs had not prevented Pinney's receiving good performance evaluations, merit increases, and incentive pay outs.  Worthy, she thought, was the main person with whom she needed to train on the specialized JPMs.  And Worthy "did not make it nice, easy, appealing, anything, to be working with him."  (Doc.

31-10 at 58.)

Alan Morrow, Pinney's direct supervisor, returned Pinney's call.  Pinney raised her concerns about training and apologized for any anger or frustration she may have let seep into her communications with management.  Morrow reported to Livingston, who had returned as chemistry manager, that the problem had been resolved.  Apparently, it had not been.

On March 12, 2008, Pinney and Worth saw each other during a plant drill.  Pinney recalls that they were unable to speak.  (Doc. 31-10 at 64.) Worthy, conversely, remembers Pinney suggesting that she could not let him hamper her movement in the company and noted that recollection in a memo to Livingston.  (Doc. 31-13 at 20.)

Livingston then called a meeting with Pinney and Morrow.  The meeting summary prepared by Morrow reflects that "Tonya did state that her and [Worthy] had a romantic relationship and it all took place at work."  (Doc. 31-29 at 6.)   Livingston "was concerned about . . . a hostile work environment for the two individuals in question."  (Doc. 31-29 at 6.)

Livingston then met with Worthy.  Though aware of the telephone call to Worthy's wife, Livingston did not reference the earlier memo from

Worthy, instead accepting Worthy's denial that any relationship with Pinney had occurred.  Worthy "stated that he is concerned that this just came down to his word against hers."  (Doc. 31-15 at 66.)  Livingston warned Worthy that lying by either party could subject him or her to dismissal.  Livingston referred the issue on to the labor relations manager who eventually assigned Sharon Bestwick, the Employee Relations Coordinator, to investigate the matter.

Bestwick interviewed Pinney on March 27, 2008; they had not met previously.  (Doc. 31-3 at 14.)  The interview lasted nearly two hours and consisted of more than thirty-five questions.  (Doc. 31-15 at 28-35.) Bestwick's eighth question sought to uncover the actual onsite location where Pinney and Worthy had sex.  Pinney responded that she "wasn't in there to file, you know, a sexual charge against [Worthy]. [She] was in there for [her] training and to have their help." (Doc. 31-10 at 68.)  When Pinney did not respond, Bestwick repeated: "where on site?"  (Doc. 31-15 at 29.) With tears in her eyes, Pinney said that she did not want to lose her job.  Yet Pinney still "gave three locations."  (Doc. 31-15 at 23.) She told Bestwick that she "didn't believe that anyone knew [about the affair]."  (Doc. 31-10

at 68.)  Bestwick questioned Pinney further about her allegations.  But Pinney "gave [Bestwick] very few examples of when [Worthy] wouldn't train her."  (Doc. 31-3 at 59.)

Bestwick then interviewed Worthy who denied any mistreatment and relationship.  Bestwick interviewed eight people total, including Pinney and Worthy.  (Doc. 31-15 at 3.)  Bestwick "focused on training and the other alleged mistreatment" because Pinney "told [her] that no one knew about the alleged relationship. . . ."  (Doc. 31-15 at 3.)  While investigating, Bestwick did not know that Pinney had contacted Worthy's wife and did not know about Pinney's complaints of disparate pay.  (Doc. 31-15 at 3.) Bestwick could not confirm Pinney's allegation that Worthy was avoiding her, concluding that "he willingly would interact with her if it was needed to get the work done. . . ."  (Doc. 31-15 at 4.)  Bestwick forwarded her report to Livingston, the chemistry manager, and Cheri Collins, the Plant Manager.

The investigation's outcome had not yet been determined when Newton provided additional information to Livingston.   Newton reported that Pinney had told him that she had previously alerted upper management to issues with Livingston and "that she had decided she was not going to be

able to get Tony [Livingston] fired, so she was going after his boy." (Doc. 31-9 at 27.)  Bestwick, Livingston, and the Plant Manager Collins interpreted "boy" as referring to Worthy.  This statement was "critical to the termination decision." (Doc. 31-15 at 4.)

> On April 17, 2008, Collins dismissed Pinney from Southern Nuclear:
>
> You recently made allegations against a co-worker, Leonard Worthy, which have been investigated.  You alleged that Leonard did not want to train you, avoided dealing with you in the work place, and stated that a sexual relationship had taken place between the two of you, ultimately stating that it had taken place on site.  Your allegations were investigated and were not substantiated.  The investigation also revealed that you have displayed behaviors that are detrimental to a team environment.  Consequently, management no longer has assurance of your trustworthiness and reliability.

(Doc. 31-16 at 6.)

Pinney filed an Equal Employment Opportunity Commission ("EEOC") charge claiming retaliation and discrimination on May 28, 2008.  And she filed this lawsuit on March 24, 2009.

III.    Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   Analysis.

A.   Title VII.

Southern Nuclear argues that summary judgment is appropriate on Pinney's Title VII claims because (1) Pinney failed to satisfy her administrative remedies in filing her EEOC claim; (2) Pinney fails to establish a prima facie case of sexual harassment; (3) it can assert the affirmative *Faragher* defense to the sexual harassment claim; (4) Pinney fails to establish a prima facie case of retaliation; (5) Pinney fails to establish a prima facie case of discrimination; and because (6) Pinney fails to establish that Southern's Nuclear's reasons for discharging her are pretext for unlawful harassment, discrimination, or retaliation.  The Court addresses Southern Nuclear's arguments in that order.

1.   Administrative Claims.

A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir.1994). In her EEOC discrimination charge, Pinney alleged discrimination based on sex and retaliation. (Doc. 31-11 at 128.) "Judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint." *Gregory v. Georgia Dept. of Hum. Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004). But "[a]llegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989). Courts remain "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII." *Gregory*, 355 F.3d at 1280.

"The proper inquiry here therefore is whether [Pinney's] complaint was like or related to, or grew out of, the allegations contained in her EEOC charge." *Id.* As Southern Nuclear suggests, Pinney now alleges sexual harassment and pay disparities unaddressed in her EEOC charge. But Southern Nuclear does not contend that Pinney asserts sexual harassment

and pay disparities as the sole basis for judicial review.   She filed that charge weeks after her termination.   Understandably, her EEOC charge focused on the events surrounding her termination.   The claimed discrimination and retaliation flowing from her termination still form a basis for her judicial complaint.  Her sexual harassment and pay disparity claims form a partial basis for judicial review, but not "the essential basis." *Wu*, 863 F.2d at 1547. The EEOC charge, moreover, does not provide a box to indicate discrimination based on pay or sexual harassment.  (Doc. 31-11 at 128.) Pinney claimed discrimination based on sex; her judicial sexual harassment and pay claims are alleged instances of sex discrimination, not a new type of discrimination.  Pinney's sexual harassment and pay claims thus grew out of the allegations in the  EEOC charge.  These claims are appropriately pled.

2.   Prima Facie Case of Sexual Harassment.

"To prove sexual harassment under Title VII, a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the

terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists." *Hulsey v. Pride Restaurants*, LLC, 367 F.3d 1238, 1244 (11th Cir. 2004).   Southern Nuclear contends that Pinney has failed to show that harassment—if any—resulted from her sex.   (Doc. 32 at 28.)   Rather, it contends, the failed relationship caused the harassment.

"In proving a claim for a hostile work environment due to sexual harassment, therefore, the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).   Personal tension rather than gender can cause the harassment of a person within a protected class: "Personal animosity is not the equivalent of sex discrimination. . . . The plaintiff cannot turn a personal feud into a sex discrimination case. . . ." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir.1986) (footnote and internal quotation marks omitted). Even if the feud results from a sexual relationship, "[w]e do not disregard this precept of sexual harassment law simply because the plaintiff and the alleged harassing party had a past sexual relationship. Regardless of the factual context, our analysis focuses

only on whether the complaining employee was targeted because of his or her gender." *Succar v. Dade Cnty. Sch. Bd.*, 229 F.3d 1343 (11th Cir. 2000).

Her relationship with Worthy, not her gender, caused any harassment. As Pinney admits, "her failed sexual relationship . . . was the source of the tension between [her and Worthy]." (Doc. 39 at 43-44.)  That relationship's end caused Pinney much turmoil: "And I was just shocked by what he said. . . . I couldn't believe that—I thought he cared. . . . I was mad at [Worthy] . . . I didn't want to be around him . . . I wasn't fit for work."  (Doc. 31-10 a 47.)  Pinney avoided him: "I just put my hand up and told him to leave me alone . . . I asked [] if I could switch crews . . ." (Doc. 31-10 at 48.)  Yet Pinney faults Worthy for similar behavior, asserting that "Worthy ignored her at work."  (Doc. 39 at 46.)  Pinney's conduct towards Worthy and Worthy's conduct towards her suggest mutual tension, not gender discrimination.

Southern Nuclear also contends that Pinney fails to show conduct sufficiently severe to alter Pinney's work environment.  Responding annually to a compliance survey, Pinney always answered that she had not been subjected to unlawful harassment or discrimination.  Pinney sought to switch

crews to avoid working with Worthy.  As Pinney states, "[Worthy] did not make it nice, easy, appealing, anything, to be working with him."  (Doc. 31-10 at 58.)  Case law looks for a "hostile or abusive" environment that is "physically threatening or humiliating," among other things.  *See Clark Cnty Sch. Dist. v. Breeden,* 532 U.S. 268, 270-71 (2001).  Worthy's actions fail to meet these factors.  The parties agree that after the relationship ended "Worthy never asked [Pinney] for sex, nor did he make any sexual comments or touch Pinney in an inappropriate manner."  (Doc. 32 at 15.)

Pinney nonetheless alleges that Worthy's actions prevented her from routine work tasks and from getting necessary training.  She contends that even though both her and Worthy "[p]retty much avoided each other," she would have to depend on Worthy to complete necessary training. (Doc. 31-10 at 52.)  Worthy assisted her in some training, but did not directly supervise her or complete her performance reviews.  Her performance reviews advised her to continue to work on training, but specified no time frame, hindered none of her merit pay increases, and resulted in no discipline.  Pinney fails to show that because of her gender Worthy created an abusive working environment altering the terms of her employment

through sexual harassment.

      3.   *Faragher* Defense.

Because Pinney fails to establish two elements necessary to her prima facie case of sexual harassment, the Court need not address the affirmative defense to sexual harassment set out in *Faragher*. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  The defense presumes sexual harassment. None occurred.

      4.   Prima Facie Case of Retaliation.

"To establish a prima facie showing of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004).   Pinney alleges that she complained about sexual harassment in her workplace.  (Doc. 39 at 52.)  An employee engages in statutorily protected expression by showing "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997).  In this case, Pinney must show that she subjectively believed

herself to be the victim of sexual harassment and that the belief was objectively reasonable. *See id.* Pinney fails to show this. Referring to her reasons for approaching her supervisors, Pinney stated "I wasn't in there to file . . . a sexual charge against Leonard [Worthy]." (Doc. 31-10 at 68.) Pinney did not believe herself to be a victim of sexual harassment at the time. She did not thus engage in protected expression and cannot establish her prima facie case.

5.    Prima Facie Case of Discrimination.

Pinney claims gender discrimination regarding her pay and her dismissal. To make out a prima facie case of discrimination, a plaintiff must show that (1) she belongs to a protected class; (2) she was subjected to an adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003). Southern Nuclear does not dispute that Pinney establishes a prima facie case regarding the pay disparities. Regarding the dismissal, Southern Nuclear contends that neither Worthy nor any other male employees are similarly situated to Pinney. The Court must "consider

whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

During the investigation into Pinney's allegations, the supervisors sought to determine whether Pinney or Worthy was telling the truth: "Mr. Livingston . . . stated that we are in search of the truth . . . . if someone is determined to be lying . . . it could be grounds for . . . dismissal." (Doc. 31-15 at 66.) Southern Nuclear dismissed Pinney and promoted Worthy. The two are similarly situated.  Pinney thus states a prima facie case of gender discrimination regarding her pay and dismissal.

      6.    Pretext.

Once Pinney meets her "burden of proving a prima facie case of discrimination by a preponderance of the evidence. The burden then shifts to the defendant to 'articulate some legitimate nondiscriminatory reason' for the alleged discrimination. If the defendant produces such a reason, the plaintiff must then prove that the legitimate reason offered was a mere pretext for an illegal motive." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992) (citing *McDonnell Douglas v. Green*, 411

U.S. 792, 802 (1973)).  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000).

       i.      Reasons for Pay Disparities.

Regarding pay disparities, Southern Nuclear contends that it sets pay based on factors other than sex, namely prior chemistry experience and performance evaluations.  (Doc. 32 at 39.)  Pinney contends that prior experience suggests pretext because Southern Nuclear required six months' classroom education before any chemist could work independently, regardless of any prior experience.  Pinney also relies on Southern Nuclear's actions after her pay complaints to suggest further pretext.

Pinney finally contends that examining the evaluations occurring during her employment shows pretext because she and her comparators had few differences.  This is immaterial as the evidence shows that any pay disparity resulted from an initial imbalance, not from subsequent performance evaluations and raises.  Pinney initially received $2,550 a

month, increased by $672 after about twenty-four months, finally increased by another $898 after eighteen more months.  Newton received $3,495 a month, increased by $463 after two years, and finally increased by another $466 after eighteen more months.  Mansfield and Patterson received $2935 a month, increased by $526 after two years, and finally increased by another $719 after eighteen more months. (Doc. 27 at 3-4.)  Pinney received higher raises than her comparators.  Thus, only Pinney's starting salary—which was less than that of her male comparators—could form the basis of a discrimination claim.

Southern Nuclear creates initial salary levels for new employees.  Each position has a base salary.  Chemistry Technician II had a base salary in 2000 of $2,375, to which Southern Nuclear adds credit for education and prior work experience, and other "[c]ompetitive" factors.  (Doc. 31-22 at 15.)  Southern Nuclear assigns no, half, or full credit for past work experience—depending on relevance to chemistry—and gives a consequent bump in monthly salary.

"Business reasons, such as experience, are legitimate 'factors other than sex' so long as" the plaintiff has an opportunity to show that they are

pretext.  *See Irby v. Bittick*, 44 F.3d 949, 956 (11th Cir. 1995).  Pinney cannot show that Southern Nuclear's relying on previous experience to determine starting salaries is pretext for paying men higher wages than women.  Rather, Southern Nuclear establishes that it applied the previous experience criterion without regard to gender.  For example, Ms. Valencia Powell received full credit for working twelve months in a blood bank;  Mr. Newton received full credit for working full-time as a chemist.  (Doc. 31-22 at 9, 22.)  Ms. Deloney received half-credit for working in Troy State University's chemistry lab; Mr. Patterson received half-credit for serving in the United States Navy.  (Doc. 31-22 at 7, 11.)  Conversely, Pinney received no credit for working in a convenience store, department store, and bank. (Doc. 31-22 at 25.)  And Mr. Newsome received no credit for working in an auto dealership and a department store.  (Doc. 31-22 at 15.)

Pinney's pay complaints and Southern Nuclear's response to those complaints do not indicate pretext.  Pinney asserts without citation that Livingston "fail[ed] to take Pinney's complaint about disparities in her pay seriously. . . ."  (Doc. 39 at 60.)  And Pinney contends that a female supervisor failed to investigate her complaints of gender-based pay

discrimination.  (Doc. 39 at 58.)  Yet Pinney does not dispute that she failed

to cooperate when the female supervisor requested additional details.

(Doc. 39 at 20.)  Regardless, the Court has reviewed the evidence underlying

the issues in Pinney's complaints—the reasons for the pay disparities—and

concludes that no pretext exists in Southern Nuclear's explanation for such

disparities.

ii.    Reasons for Dismissal.

Southern Nuclear asserts that it dismissed Pinney because the

investigator and decision maker believed in good faith that Pinney's

allegations were false.  *See EEOC v. Total. Sys. Servs., Inc.*, 221 F.3d 1171,

1176 (11th Cir. 2000) ("And, at least when the circumstances give the

employer good reason to believe that the fictitious version was the result of

a knowingly false statement by one of its employees, the law will not

protect the employee's job.")  Southern Nuclear states three reasons for the

good faith belief: that Pinney's account changed and was vague, that

Bestwick could not corroborate Pinney's allegations, and that evidence

suggested that Pinney sought Worthy's dismissal.

Pinney must offer evidence that Southern Nuclear's reason is pretext

for illegal gender discrimination.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  "[Pinney] may not establish that [Southern Nuclear's] proffered reason is pretextual merely by questioning the wisdom of [its] reason, at least not where . . . the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).

Even though Ms. Bestwick investigated Pinney and even though Ms. Collins dismissed her, Pinney still contends that Southern Nuclear's reason for dismissing her conceals gender discrimination.   Pinney argues that Southern Nuclear "knew at the time that Pinney was not lying about the affair," that "Pinney did not give vague and changing accounts of what happened," that "Bestwick would have been able to corroborate Pinney's statements if she had conducted a thorough investigation," and that "[t]here is no evidence that Pinney was targeting Worthy." (Doc. 39 at 61-63.)

Pinney fails to establish that Bestwick or Collins knew she "was not lying." (Doc. 39 at 61.)  Pinney cites the memo from Worthy that Livingston possessed as proof that Worthy, not her, was lying about the affair.  First,

Bestwick did not have the memo during the investigation.  Neither did Collins.  Further, even if either knew about the memo, nothing in it undermines their good faith belief that Pinney was lying, as the memo itself fails to prove the affair.  The memo from Worthy recounts the following: "A voice on the other end said, 'this is Tonya, I work with your husband, and we've been having an affair for about 2 years.'" (Doc. 39-1 at 2.)  This memo—at best—establishes that Pinney had previously alleged an occurring affair to add to her more recent allegations.  But Southern Nuclear distrusted Pinney's allegations.  The memo would not have changed Bestwick's inquiry.  Bestwick would still have had to determine who to believe, Worthy or Pinney. The memo does not undercut Southern Nuclear's reasons for dismissal, Pinney's untrustworthiness and Bestwick and Collins' good faith belief in Pinney's untrustworthiness.

Pinney next contends that her story was clear because "she did not tell Morrow that she and Worthy conducted their affair off site, then tell Livingston that their encounters occurred on plant property."  (Doc. 39 at 62.)  To Morrow, Pinney had said that she and Worthy became "involved." (Doc. 31-15 at 74.)  When Morrow asked if that meant "they were involved

in a relationship outside of work," Pinney affirmed. (Doc. 31-15 at 74.)

Later, to Livingston, "Tonya did state that her and Leonard [Worthy] had a

romantic relationship and it all took place at work."  (Doc. 31-15 at 68.)

Taken together, Pinney admitted to a relationship outside of work that took

place entirely at work.  Bestwick reasonably concluded that her account was

vague.

Pinney also argues that a thorough investigation would have allowed

Bestwick to corroborate her story because "some co-workers were able to

observe Pinney and Worthy's intimate behavior at work, including . . . Lex

. . .[and] David . . . ."  (Doc. 39 at 62.)  But Pinney does not dispute that

she lead Bestwick to believe that no one knew about the affair.  Indeed,

only now, after "hav[ing] had plenty of time to think about this" does

Pinney recall specific incidents in which co-workers might have seen

something supporting her allegations of an affair.  (Doc. 31-10 at 48.)  And

even now she remains unsure: "Lex said that he did not see that. . . . I don't

know if [David] saw anything . . . ."  (Doc. 31-10 at 48.)  Regardless, Pinney

herself points out that she did not go to management to file a sexual charge.

In interviewing subsequent employees, Bestwick reasonably chose not to

pursue questions about the alleged affair unrelated to the reason—her training—that Pinney went to management.  Instead, Bestwick focused on the allegations related to workplace training.

Pinney finally argues that denying Newton's statement after her dismissal discredits the statement in which she allegedly intended to go after Livingston's boy.  (Doc. 39 at 63.) Yet Pinney does not dispute that Newton relayed this statement to the decision-makers, whether it was true or not.  And Pinney does not dispute that Livingston, Bestwick, and Collins interpreted the statement as referring to Worthy.  (Doc. 32 at 24; Doc. 39 at 16.)  Whether Pinney targeted Worthy or not does not undercut Southern Nuclear's reasons for dismissal—untrustworthiness and Bestwick and Collin's good faith belief in Pinney's untrustworthiness.

In sum, Southern Nuclear contends that Bestwick and Collin's good faith belief in the falsity of Pinney's allegations led to her dismissal.  Pinney must show that the reasons for dismissal were pretext for actual gender-based discrimination.  Not only has she failed to show the reasons were pretext, but she also has not shown that her gender played a role in her dismissal.   Rather, Pinney provides evidence suggesting that the

investigation could have been more thorough.   But "questioning the wisdom" of Southern Nuclear's actions does not establish gender discrimination.  *Combs*, 106 F.3d at 1543.  Pinney fails to provide evidence that Ms. Bestwick and Ms. Collins discriminated against her because of her gender.

B.     EPA.

"An employee demonstrates a prima facie case of an Equal Pay Act violation by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require equal skill, effort, and responsibility, and which are performed under similar working conditions." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077-78 (11th Cir. 2003) (citations and quotations omitted).  Southern Nuclear concedes that Pinney has met her prima facie case.  "Once a prima facie case is demonstrated, to avoid liability the employer must prove by a preponderance of the evidence that the differential is justified by one of four exceptions set forth in the EPA." *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).   The following constitute the four exceptions: Payment under "(i) a seniority system; (ii) a merit system; (iii)

a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206 (d)(1).  As shown in Part IV.A.6.i., Southern Nuclear's pay scheme rewards prior experience—a "factor other than sex"—in a nondiscriminatory manner. *See Irby v. Bittick*, 44 F.3d 949, 956 (11th Cir. 1995).  Southern Nuclear has met its burden to avoid liability rendering summary judgment appropriate on the EPA claim.

> C.   EPA Retaliation under the FLSA.

The plaintiff must first establish a prima facie case of retaliation. *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000). The employer then must assert a legitimate nonretaliatory reason for the adverse employment action. *Id*. If the employer does this, the plaintiff must establish that the proffered reason is pretextual.  *Id*.

"A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: (1) she engaged in activity protected under [the FLSA]; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Id*. at 1342.

Pinney cannot meet her burden of showing a causal connection between her oral discussions in 2006 and her dismissal in 2008.   "In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights." *Id.* at 1343.   A plaintiff may establish this causation by proving that the dates of her employer's learning of her protected activity and her dismissal are "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).   Pinney suggests that her oral complaints caused her dismissal, which occurred nearly two years later.   But three months or even seven months is too long. *See Raspanti v. Four Amigos Travel, Inc.*, 266 Fed. App'x 820, 823 (11th Cir. 2008).   Without more, nearly two years is too long as well.

Southern Nuclear, moreover, offers evidence other than time's passage to break the causal chain.  For both 2006 and 2007, Pinney fully met her performance requirements, receiving a merit pay increase and an incentive bonus.   This suggests that Pinney's oral complaints had little effect on her next performance reviews, much less her later dismissal. Moreover, "[i]n order to satisfy the 'causal link' prong of a prima facie retaliation case . . . the plaintiff must show that the corporate agent who

Page 32 of  33

took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action." *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). Plant Manager Collins decided to terminate Pinney.  Collins did not know that Pinney had complained about pay disparities or overtime.  (Doc. 31-16 at 3.)  Pinney fails to establish a prima facie case of retaliation under the FLSA.

V.     Conclusion.

For the reasons stated above, Southern Nuclear's motion for summary judgment on Pinney's claims is GRANTED.  A separate order will be entered that conforms to this Opinion.

Done this 31<u>st</u> day of <u>March 2011</u>.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
159890